Filed 8/28/23  P. v. Richard CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>TEARRI J. RICHARD, et al.,<br><br>    Defendants and Appellants. | A162365, A162369<br><br>(Contra Costa County<br>Super. Ct. No. 52001147) |

In September 2019, Raul Garcia was shot and killed while driving his car following a confrontation at a Chevron gas station with defendants Tearri Richard and Lakia Poles.  Defendants were tried and convicted of first degree murder, and Richard with the special circumstance of drive by murder as well as an enhancement allegation that he discharged a firearm causing great bodily injury and death.  Richard argues (1) that the prosecution exercised a peremptory challenge against an African American prospective juror in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), (2) his counsel provided ineffective assistance by failing to object to certain of the prosecutor's remarks during closing argument that allegedly shifted the burden of proof, (3) the prosecutor committed misconduct during closing argument by inaccurately describing the law of voluntary manslaughter, and (4) the

1

cumulative effect of the alleged errors requires reversal. Poles argues that substantial evidence does not support the intent requirement of her conviction for aiding and abetting the murder and that the jury failed to draw reasonable conclusions from the circumstantial evidence that pointed to her innocence. We affirm.

## BACKGROUND[1]

### The Shooting

On September 1, 2019, Nathaniel Harrison, Rudy Garcia, Raul Garcia, and Norman Beals were helping Damian Rudd and his wife Oprea move items out of their house in Antioch and into a storage facility, using a rented U-Haul truck and Raul's car. At around 8:40 p.m., they made a final trip to the storage facility. Rudd was driving the truck with Harrison in the passenger seat; Raul was driving his car with Rudy in the front passenger seat and Beals in the back. When they got to the U-haul facility, they found it closed, so they went to a Chevron station next door to turn the truck around.

As they were in the process of turning the truck around, a woman in a small, compact white car pulled up very close to the passenger side of Raul's car. The woman was a "light-skinned" African-American, slim, in her twenties, with long hair, and was constantly on the phone. She was "highly upset" and "hysterical" because she was blocked by the truck and could not exit the service station.

As Beals put it in an interview with police, "all a sudden she just jump out, 'Move this piece of shit out my motherfuckin' way. Move this shit outta my motherfuckin' way you dope fiend motherfuckers." The woman also said "

---

[1] We provide a factual summary only as necessary for background and to decide the issues on appeal.

'Yeah.  I know you dope fiend motherfuckers.  I ain't trippin'—you crackhead motherfuckers whoo-whoo.  I have my nigga come pop y'all ass.' "  She also said " 'I have my nigga come do this.  I have my nigga come do that.' "  According to Beals, the woman "was just doin' too much" and "wouldn't let up."

The woman was soon joined by a "light-complected, African American male with shoulder-length dreadlocks" and tattoos on his arm, about 5'7 or 5'8, who said the woman was his "girl."  The man said he was going to "spray all of you" (which Harrison understood to mean shoot them) and then went to the trunk of his car and returned with his hands in his pants, saying again "I'll spray all you," "I'll kill all you motherfuckers," and "I'll shoot all you motherfuckers."  The man then took his hands out of his pants to throw a punch at Rudy, who was still sitting in the passenger seat of Raul's car, and they realized the man did not have a gun.[2]  Everyone then returned to their vehicles.

Rudd and Raul drove their vehicles onto the freeway.  According to Rudy, "[w]hen we were getting on the freeway, waiting for the light, the female passes us in her car just dogging us, just looking at us crazy, you know.  My brother, like, stopped his car, took pictures of her, took two pictures, and then my brother just jumped on it, got on the freeway doing about 70 miles an hour."

Raul drove past the exit for Rudd's house, then exited the freeway at the next exit, got back on the freeway heading the opposite direction, got off the freeway at the exit to Rudd's house, and then drove toward Rudd's house, all the while being pursued by the woman in the white car.  When they were

---

[2] According to Beals, the man "got to screamin' and yellin', like, 'I oughta pop the shit outta you—I'll kill you motherfuckers.  You motherfuckers don't know me.'  Whoo—whoo—whoo."

about a block from the house, Rudy heard the voice of the man from the gas station say, "Now what, motherfucker?" followed by three to four gunshots. Rudy heard Raul say, "I got hit." Raul was bleeding and was taken by ambulance to the hospital, where he died of blood loss caused by a single gunshot wound to his back.

Antioch Police Detective Adrian Gonzalez retrieved the photos from Raul's phone depicting the white car, and was able to identify certain characters of the license plate and determine that the car was a white Nissan Altima between the years 2003 and 2006. Detectives also combined various surveillance video showing a white Mercedes sedan coming rapidly from behind a white Nissan that was traveling behind Raul's Saab. As the three vehicles approached the scene of the shooting, the white Mercedes was ahead of the Nissan and directly behind the Saab. Another video showed the two white sedans driving away from the area of the shooting a couple minutes later. A database search revealed that a white Nissan Altima with a license plate number consistent with that seen in Raul's pictures was registered to Poles, and a white Mercedes sedan was registered to Richard. Cell phone records showed that Richard and Poles were on the phone with each other shortly before the time of the shooting, and were using cell phone towers consistent with the route of the vehicles as shown in the surveillance videos.

**The Proceedings Below**

On January 21, 2020, the Contra Costa County District Attorney filed an information charging Richard and Poles with Raul Garcia's murder (Pen. Code, § 187, subd. (a))[3], alleging the special circumstance of drive by murder with respect to Richard (§ 190.2, subd. (a)(21)), and an enhancement

---

[3] Further undesignated statutory references are to the Penal Code.

allegation that Richard personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)).

Trial took place over 26 days in September, October, and November of 2020.

On November 23, 2020, the jury found Richard and Poles guilty of first-degree murder, and found true the special circumstance allegation of drive by murder as well as the personal and intentional firearm discharge enhancement.

On March 19, 2021, the trial court sentenced Richard to life without the possibility of parole, and Poles to a term of 25 years to life.

Richard and Poles each filed a notice of appeal.[4]

## DISCUSSION

### Richard's Appeal (A162365)

**The Trial Court Did Not Err in Overruling Richard's *Batson/Wheeler* Objection to the Peremptory Challenge of Prospective Juror D.C.**

**Background**

Potential juror D.C. was an African American woman who was employed as a head lab assistant.

During a discussion with the jury panel about stand your ground laws, Mr. Burke, Poles' counsel, had the following exchange with D.C.:

"Q. Is there anyone who thinks that that law either ought to be changed or they disagree with that change so fervently that you would have difficulty sitting as a juror in this case? And by that law, I mean what I spoke about with [another potential juror] about standing your ground and there's no duty to retreat.

---

[4] On July 13, 2022, we granted the Attorney General's unopposed motion to consolidate the appeals.

5

"THE COURT: And again, it's all out of context and not thoroughly explained through the instructions.

"MR. BURKE: Q. Everything will be thoroughly explained to you at the end of the case, and you'll get some pre-instructions. I'm just trying to ask folks. I talked to people that say we need to get rid of these stand your ground laws. Does anyone think maybe that you would not be able to follow it? Anyone feel that way, that I don't like those laws; I would like to see those changed? [¶] [D.C.], why is that?

"[D.C.]: A. I have an issue with people of the same race that have—

"THE COURT: Microphone, please. Hold on. Dina can't hear you.

"[D.C.]: People of the same race as me may not be given the same rights, or we have had issues in current climates with people of color have been having issues.

"MR. BURKE: Okay. There's an interplay with that in stand your ground laws is that what you're saying?

"[D.C.]: Yeah. There was a direct with Trayvon Martin, right? And there are cases where, you know, women of color who have used self-defense have been charged as guilty, and you know, they're not considered the same. So that's my problem with it.

"MR. BURKE: I can tell you everyone in this courtroom and all the evidence you hear here we're going to try to be as fair as possible, and we're going to try to get a jury to be as fair as possible, but we shouldn't ignore the fact that Ms. Poles and Mr. Richard are African American, and you heard from the questionnaire that Mr. Raul Garcia, who is deceased, is Hispanic. Is that going to create any issues with you potentially sitting as a juror in this case?

"[D.C.]: No."

6

Later on in the jury selection process, there was another conversation with D.C., counsel, and the trial court outside the presence of the other prospective jurors regarding whether jury service would interfere with D.C.'s worker's compensation. After that discussion ended, the following exchange took place:

"THE COURT: Okay. There is one thing, as long as you're here, that came up in Mr. Burke's questioning that I just wanted to clarify as far as the self-defense because I know you were concerned about stand your ground.

"[D.C.]: Right. I know it's my concern basically for other states.

"THE COURT: Okay.

"[D.C.]: I know California is very, um, my concern was basically what's going on in other states.

"THE COURT: So this is, in essence, more of a road-rage situation than it is some sort of race case.

"[D.C.]: Right. I understood he was just putting the scenario out there.

"THE COURT: So you're okay then?

"[D.C.]: I'm Okay.

"THE COURT: Any follow-up Mr. DeFerrari?

"MR. DEFERRARI [prosecutor]: Thank you, your Honor. [D.C.], obviously, when we were doing this, I didn't get a chance to follow up on that answer which you gave. When you talked to Mr. Burke, the thing that caught my attention was I think you said there are cases where women of color who have used self-defense have been charged as guilty, and they're not.

"[D.C.]: Uh-huh.

"MR. DEFERRARI: Obviously, that got my attention. There's a woman of color on trial here. Mr. Burke—I don't know what the defense is going to be. I don't. I'm not entitled to know. It's up to the Defense if they're

7

going to make one or not. My concern is when you answered that way if this does come up, should I have a concern about that?

"[D.C.]: No. Because I'm willing to look at the evidence that I'm provided. I'm not in a pre-disposition. So I don't feel that from what I've heard of this case, it's not very similar to what I've heard and what I was mentioning in other cases where I've heard of women who have acted in self-defense but were charged.

"THE COURT: You're thinking more of domestic violence type of cases?

"[D.C.]: Yeah. More of a domestic violence.

"MR. DEFERRARI: Anything else you were thinking of along those lines?

"[D.C.]: No. It's also the cases that I've heard of were self-defense in a relationship."

The prosecutor ultimately exercised a peremptory challenge to dismiss D.C. from the jury pool. Both defense counsel objected on *Batson/Wheeler* grounds. Richard's counsel explained:

"MS. SCOFIELD: Yes. [D.C.] is an African American woman. My client, Mr. Richard, as well as Ms. Poles are African American defendants in this case. I think that the use of a peremptory challenge was race-based. There are very few African Americans on the jury panel, and specifically in panel one. She is a woman also, which I also think is a protected class. The only other African American currently on the jury panel is (Juror Number 22). Given her statements and how she would follow the law and the question posed of her, it is my belief that there is a prima facie basis at this time for a *Batson/Wheeler* motion."

8

The trial court found that a prima facie case had been made, and asked the prosecutor "to explain a permissible race-neutral justification for the peremptory challenge to [D.C]." The prosecutor responded:

"MR. DEFERRARI: So there were two reasons. The first happened yesterday during Mr. Burke's questioning of her. Mr. Burke asked, There's an interplay with that and stand your ground laws is what you're saying? [D.C.] responded, Yeah. There was a direct with Trayvon Martin, right? And there are cases where, you know, women of color who have used self-defense have been charged as guilty and, you know, they're not.

"At the time when we went back in chambers, I asked the Court to follow up. There wasn't time to do that. She came in this morning regarding a Workers' Compensation issue. We followed up. She said that was related to other states in domestic violence cases. I'm still extremely concerned about that answer. That answer causes me to think that she is open and accepting to the idea that women of color are falsely accused in cases where stand your ground could be used as a defense. And apparently, that's going to be the defense or could be the defense in this case for Ms. Poles.

"So when a juror, any juror—no other juror in this whole all the people we've talked to has said has said yes, I'm concerned because women of color are often charged as guilty when they have stand your ground as a defense. That was unique to her.

"The second thing happened this morning and was actually even more concerning to me or as concerning, tipped me well over the edge. She wore a shirt that said—that had the Tide logo, but instead it said vote removes orange stains. Now, it doesn't matter for me what side of the political spectrum she's on. What matters is that a juror wears a political shirt to jury service. I have a serious concern that that is something that's going to

9

polarize other jurors. For example, if a juror came in wearing a Make America Great Again hat or Make America Great Again shirt, openly displaying what could be a controversial opinion. I understand this is Contra Costa County, and seven out of ten registered voters are registered Democrats, but that leaves three others. I think it could alienate other jurors. Frankly, it gives me great concern.

"I think she had a very affable personality. She seemed friendly. She had what I perceived to be sort of a big personality, and I worry that somebody who is coming to court in a T-shirt with their political opinions on their sleeve could at the end of the day, whether she's for or against a guilty verdict and who knows what she would find, she would alienate other jurors because of those types of opinions. That tipped me well over the edge this morning after she mouthed or said the defense that I anticipate the Defense will raise, at least for Ms. Poles in this case, and then wore the shirt, those two things led me to believe I needed to exclude her."

After further argument from counsel, the prosecutor made the following concluding remarks:

"THE COURT: Mr. DeFerrari, I'm going to give you the last word.

"MR. DeFERRARI: Right. I mean, as much as I would like to bring Donald Trump into this courtroom, because apparently he's relevant to what we're proceeding on here, that's ridiculous. Here's the bottom line. Somebody's viewpoint, whether it's associated with their race or not, is not me kicking somebody for their race. For example, the juror that you let go for cause today, this is a juror I would have most certainly kicked, Ms. B[.] Ms. B[.], who was Caucasian, has extreme views or has views about her white privilege. She believes that nonwhites are unequally treated under the law. She said her white privilege leads her to distrust police. I would have

10

excluded her if she hadn't been excused for cause because she doesn't trust the police. That is not a view—her viewpoint is not unique to her race. Neither is [D.C.]'s. [D.C.] has a viewpoint that African American women have been falsely accused when they defend themselves with stand your ground laws. That, her view does not mean I'm kicking her because of her race. It's because of a viewpoint that she has that it has to do with race. That does not mean I'm kicking her because she's African American. It's because I don't think her viewpoint on this topic is favorable to the Prosecution. White people may hold that viewpoint too, and I would kick them even though they were white and they think that African Americans have been mistreated by the police. I'm kicking them for their viewpoint, not their ethnicity.

"THE COURT: I understood her to be addressing two separate things, and the way you just said them kind of merged them. I understood her stand your ground to be directed at Trayvon Martin and her women of color concerns to be directed towards domestic violence.

"MR. DeFERRARI: No. Here's what she said.

"THE COURT: Okay. Don't talk too fast.

"MR. DeFERRARI: And she said there are cases where, you know, women of color who have used self-defense have been charged as guilty and, you know, they're not.

"THE COURT: I know, but that's different than the stand your ground, right?

"MR. DeFERRARI: This morning she talked about how that related to domestic violence and how women of color should have been able to use, in other states, use stand their ground to defend themselves. Listen, and she did believe or she talked about how that was related to domestic violence.

11

Either way, my reason for excluding her is not because of her race. It's because of her views on this topic. Whether she's white or Asian or any other ethnicity, if she had said this, I would have put a big red flag on that and probably kicked her. It doesn't matter that she's African American. If she would have said what she said and raised this specter of self-defense and women of color being wrongfully charged when they use self-defense—no one else said that—I would have kicked her just the same as I would have kicked Ms. B[.] had you not excused her for cause for her views about white privilege and nonwhites are unequally treated under the law. Those are things that— those are viewpoints people have."

The trial court indicated it would decide the *Batson*/*Wheeler* motion the next day. And the next day, the trial court denied the motion with this explanation:

"THE COURT: . . . Let me state why. As you know, I spent—since January, I spent four years doing the fast track department, so I'm just getting back into doing trials, and so the law is not as ready in my brain as it is when I'm doing trials on a regular basis. So I did have to go look at *Wheeler* and the subsequent act. I think what I was commenting about yesterday was almost equivalent to treating Mr. DeFerrari's concerns as a challenge for cause rather than an actual *Wheeler* motion. So I need to go back and say, obviously, the first step in examining a *Wheeler* motion is whether a prima facie case has been made out. It's a little difficult when the first—when we've been doing this for a while, and then a[n] African American woman is challenged, to say that there's any sort of pattern. But for the fact that her answers to some of the issues that came up included race issues for her, I don't know that, in the big picture, I would have found a prima facie case, but I'm going to treat it as if I did.

12

"Mr. DeFerrari then laid out a basis for his peremptory challenges—peremptory challenge, I beg your pardon—and I needed to consider whether they were race neutral or not rather than the higher concern about challenge for cause. I do find that certainly the T-shirt concern is race neutral, and I do understand and would agree that could be divisive because we have a wide variety of political opinions in Contra Costa County, and we're not here to decide the presidential race.

"Also, her concern about women of color in domestic violence situations I honestly I don't know what the defense is going to be, and whether that is part of it or not I don't know, but I don't have to be concerned with that in terms of a *Wheeler* motion. I think that that I would also consider race neutral. That can be true of any race or ethnicity.

"And then the stand your ground issue, again, I can't examine it like it's a challenge for cause and say she rehabilitated herself. It's really this is a peremptory challenge, and I don't find that overall that basis is based on her race, so I would note Mr. DeFerrari did file this morning a jury selection briefing, which I read after I sent out my email to you all, and I think it sets out the law and supports the Court's decision eloquently, so with that, we will—

"MS. SCOFIELD: Your Honor, I'm sorry. Weren't you going to ask for comments?

"THE COURT: No. I made my decision. You've had your chance to comment yesterday. So [D.C.] then needs to be called off. She is excused."

**Applicable Law**

In *Batson*, the United States Supreme Court held that the exercise of a peremptory challenge for a discriminatory purpose offends equal protection under the Fourteenth Amendment. (*Batson*, *supra*, 476 U.S. at p. 89.) Years

13

earlier, the California Supreme Court held in *Wheeler* held that such conduct violated the California Constitution's guarantee of a trial by a jury drawn from a venire representative of the community.  (See *People v. Huggins* (2006) 38 Cal.4th 175, 226; *People v. Lenix* (2008) 44 Cal.4th 602, 612 ["Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race"].)

" 'There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).)  'A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." ' (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.)" (*People v. Parker* (2017) 2 Cal.5th 1184, 1210–1211.)

" ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. . . .  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." ' (*People v. O'Malley* (2016) 62 Cal.4th 944, 975

14

(*O'Malley*).) ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*).)

" ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " ' (*People v. Vines* (2011) 51 Cal.4th 830, 848 (*Vines*).) However, ' "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." ' (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171 (*Gutierrez*).)

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges. 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." '

(*People v. Lenix*[, *supra*,] 44 Cal.4th [at pp.] 613–614 (*Lenix*); accord, *People v. Winbush* (2017) 2 Cal.5th 402, 435 (*Winbush*).)" (*People v. Miles* (2020) 9 Cal.5th 513, 539.)[5]

**Analysis**

Richard argues that the trial court did not conduct step three of the *Batson/Wheeler* analysis at all, and that we should therefore conduct that step de novo. We disagree. As our Supreme Court explained in rejecting a similar argument in *People v. Lewis* (2008) 43 Cal.4th 415, 471, where the trial court had denied *Batson/Wheeler* motions "without any comment or discussion": "The trial court denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 471, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912; see *People v. Jones*, *supra*, 51 Cal.4th at p. 361; *People v. Mai* (2013) 57 Cal.4th 986, 1054.) And as noted, "[w]hen the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings."[6] (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

---

[5] Assembly Bill No. 3070 (2019–2020 Reg. Sess.), legislation that significantly modifies the *Batson/Wheeler* framework, was signed into law in 2020. Among other things, it provides that some reasons for striking a juror, including distrust of law enforcement and the criminal legal system, are presumptively invalid. (Code Civ. Proc., § 231.7, subd. (e).) The legislation has no bearing on this appeal, however, because it applies prospectively to trials "in which jury selection begins on or after January 1, 2022." (*Id*., subd. (i).)

[6] For this reason, we reject Richard's alternative argument that "[b]y completing step two, and then immediately cutting off step three by preventing appellant's attorney from making any further comment," the trial

16

The balance of Richard's argument is somewhat unclear. He concedes that the prosecutor's reasons for striking D.C. were "facially race-neutral," but argues that they were nevertheless "inextricably intertwined with race" and thus "constitute[d] *Batson*/*Wheeler* error." He does not explain how the trial court erred in crediting the prosecutor's justifications, but instead appears to argue that those justifications must have been pretextual because they were "inextricably intertwined" with, and therefore a proxy for, race.

The prosecutor gave two explanations for his decision to use a peremptory challenge on D.C. The first was her statement that "women of color who have used self-defense have been charged and guilty, you know, they're not considered the same." The prosecutor was evidently concerned that Poles, an African-American woman, would assert some sort of self-defense or stand your ground argument as part of her defense. Indeed, the jury was ultimately instructed on self-defense, imperfect self-defense, and heat of passion voluntary manslaughter. As Richard appears to concede, this was a race-neutral justification for striking D.C., even if such attitudes were more prevalent among African-Americans. (See *People v. Avila* (2006) 38 Cal.4th 491, 543–545 [rejecting *Batson*/*Wheeler* challenge to strike where "[t]he prosecutor's challenge to [the juror] was based on her *personal experience* that police officers lied, not on a theoretical perception that she, a member of a minority group, might view the police with distrust"].) Moreover, as the prosecutor explained, he would have exercised a peremptory challenge to strike a juror of any race who held this view, going on to give the example of another prospective juror—Ms. B.—who was White but held a

court failed to conduct step three at all and that therefore the appropriate remedy is to conditionally reverse the judgment so that step three can be conducted on remand.

similar view that "nonwhites are unequally treated under the law," explaining that he would have struck her for the same reason had she not been excused for cause. Richard does not offer any reason that the trial court erred in crediting this explanation.

The second reason offered for the peremptory strike was that the T-shirt D.C. wore to jury duty—which said "Vote removes orange stains"—was a political statement that could be divisive among the jurors. Richard argues that because D.C.'s shirt was indicative of opposition to Donald Trump, and because Trump had several months earlier described New York City's decision to paint the words "Black Lives Matter" on Fifth Avenue as a "symbol of hate," this second justification for striking D.C. was "inextricably intertwined with race."

To begin with, Richard somewhat mischaracterizes the prosecutor's justification. The justification was not based on D.C.'s political views themselves, with the prosecutor expressly stating that "it doesn't matter for me what side of the political spectrum she's on." Rather, it was based on her being "a juror [who] wears a political shirt to jury service," and the accompanying concern "that that is something that's going to polarize other jurors." This was a race-neutral justification for the strike. (See, e.g., *People v. Mills* (2010) 48 Cal.4th 158, 184 [upholding peremptory challenge based in part on justification that juror " 'was a wild card type of juror who had extremely strong positions, and I didn't feel that she would interact with the rest of the jurors that I was anticipating selecting' "]; *People v. Watson* (2008) 43 Cal.4th 652, 681 [peremptory challenge supported in part by concern that juror was "too stubborn and opinionated to appropriately participate in jury deliberations"].) Again, Richard does not offer any reason

18

for us to conclude that the trial court erred in crediting the prosecutor's second justification.

In arguing that the trial court committed *Batson/Wheeler* error, Richard relies heavily on *People v. Silas* (2021) 68 Cal.App.5th 1057 (*Silas*), where the court found *Batson/Wheeler* error because the prosecution's facially race-neutral justifications for striking potential Juror No. 275 were either unsupported by the record or based on "inappropriate questioning about Black Lives Matter." (*Id*. at p. 1108.)

In *Silas*, prospective Juror No. 275 was a 25-year-old African-American woman. (*Silas*, *supra*, 68 Cal.App.5th at p. 1070.) In response to a question on the jury questionnaire regarding involvement with " 'law or justice-focused special interest groups,' " she wrote "I support Black [L]ives Matter." (*Ibid*.) After discussing the credibility of law enforcement witnesses, the court asked the jurors whether they could " 'follow [its] instructions with regard to evaluation of witness testimony,' " and observed that unlike other potential jurors, Juror No. 275 did not nod her head. (*Id*. at p. 1071.) In response to a question about how the criminal justice system treats people differently, Juror No. 275 responded, " 'My feelings about sentencing based on the crime. I don't think it's necessarily fair for—I've noticed that Black people—how I feel is that Black people are being sentenced longer than other races.' " (*Ibid*.) The prosecutor then questioned Juror No. 275 about whether she would "agree" that " 'individuals as part of [the Black Lives Matter] movement that, for instance, destroy property that's not their own" and "In general, your support for Black Lives Matter, do you agree or do you disagree with that type of behavior, that is, destroying other people's property?' " to which Juror No. 275 replied " 'No, I don't.' " (*Id*. at p. 1072.)

19

After the trial court denied the prosecutor's challenge to Juror No. 275 for cause, the prosecutor exercised a peremptory challenge to remove her, and the defense objected on *Batson/Wheeler* grounds. (*Silas*, *supra*, 68 Cal.App.5th at pp. 1073–1075.)  The trial court found that defendants had not established a prima facie case of discrimination and denied the motion. (*Id*. at pp. 1075–1076.)  Later, the prosecutor gave the following reasons for striking Juror No. 275:  " 'She was openly hostile, to say the least, when I was questioning her about Black Lives Matter.  She disagreed that Black Lives Matter, there is a contingent within it [that] destroys property or . . . riots. That's just absolutely not true or . . . she has chosen to close her eyes to it. [¶]  She has strong opinions of law enforcement in the negative way.  And she did not nod to treat law enforcement equally.  [¶]  She arrived late.  She wanted absolutely nothing to do with this case.  And with her arms crossed, was openly angry with me in my questioning, for whatever reason.' "  (*Id*. at p. 1075.)

*Silas* first concluded that insufficient evidence supported the trial court's first stage ruling.  (*Silas*, *supra*, 68 Cal.App.5th at pp. 1096–1100.) *Silas* then concluded that the prosecutor's justifications for striking Juror No. 275 met the "low bar" for facial neutrality, finding with respect to Black Lives Matter as follows:

"Nor can we say that the prosecutor's reasons related to Black Lives Matter amounted to a proxy for race.  The parties agree that 'support for [Black Lives Matter] is correlated with race,' as Black people are not only statistically more likely to support the movement but also linked with it in the 'public consciousness.'  There is a line of decisions finding 'discriminatory intent to be inherent in . . . generic "group-based presuppositions" ' about how a juror may view the case.  ([*People v*.] *Gutierrez* [(2017)] 2 Cal.5th [1150,]

20

1167–1168, quoting *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 825 [peremptory challenge based on prosecutor's assumption about attitude of juror who lived in 'area heavily populated by poor [B]lack people']; see, e.g., [*People v.*] *Douglas* [(2018)] 22 Cal.App.5th [1162,] 1171–1172 [prosecutor assumed jurors would react to victim in particular way merely because they were gay].) But our state Supreme Court has distinguished challenges based on *assumptions* about a juror from challenges based on a juror's actual beliefs, even if those beliefs are more likely to be held by a particular group. (*People v. Avila*[, *supra*,] (2006) 38 Cal.4th [at pp.] 542–545 [Black prospective juror's negative view of police 'based on her *personal experience* that police officers lied, not on a theoretical perception that she, a member of a minority group, might view the police with distrust'].) Here, the prosecutor did not justify the challenge to Prospective Juror No. 275 based on assumptions about what attitudes the juror held because of her support for Black Lives Matter. Instead, the prosecutor purportedly based it on the juror's actual reaction and responses to questions about the movement. Under binding authority, these were sufficiently race-neutral reasons for the peremptory challenge at *Batson*/*Wheeler*'s second stage." (*Silas*, *supra*, 68 Cal.App.5th at pp. 1102–1103.)

At *Batson*/*Wheeler*'s third stage, *Silas* went on to conclude that the prosecutor's reasons "do not hold up to scrutiny." (*Silas*, *supra*, 68 Cal.App.5th at p. 1104.) *Silas* found that "[a]s the record shows, and as the trial court explicitly ruled, Prospective Juror No. 275 did *not* deny that some people who participate in Black Lives Matter demonstrations destroy property," that it was Prospective Juror No. 211 who arrived late, not Juror No. 275, and that "the record also does not support the prosecutor's claim that Prospective Juror No. 275 held a negative opinion of law enforcement."

21

(*Id*. at pp. 1104-1105.) *Silas* found that "the record lacks evidence on which the trial court could have concluded that the challenge to Juror No. 275 was not ' "motivated in substantial part by discriminatory intent." ' [Citation.] The prosecutor's reasons for striking Prospective Juror No. 275 were either unsupported or based on inappropriate questioning about Black Lives Matter, and the court erred by crediting them." (*Id*. at p. 1108.)

Richard argues that "like in *Silas*, the reasons the prosecutor gave for seeking to dismiss were inextricably intertwined with race," pointing to *Silas*'s statement that "since support for Black Lives Matter is not, as the parties concede, a race-neutral reason for striking a prospective juror, an assumption about a juror's opinions based solely on that support cannot justify a peremptory challenge," and arguing that political opposition to Donald Trump is similar. (*Silas*, *supra*, 68 Cal.App.5th at p. 1105.)

To begin with, *Silas* does not directly stand for the proposition that support for Black Lives Matter is not a race-neutral justification for a peremptory strike. As noted, in *Silas*, the prosecutor did not justify the strike based on juror 275's support for Black Lives Matter. (See *Silas*, *supra*, 68 Cal.App.5th at p. 1102 ["the prosecutor did not say, in so many words, that she was challenging Juror 275 merely because of the juror's support for Black Lives Matter. Rather, it was Prospective Juror No. 275's *reactions* to questions about the movement that the prosecutor found objectionable"].) And the Attorney General conceded in *Silas* for purposes of argument that support for Black Lives Matter would not be a race-neutral justification. (See *id*. at p. 1105.) " '[A]n appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided." ' " (*People v. Evans* (2008) 44 Cal.4th 590, 599, quoting *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

22

In any event, Richard misunderstands *Silas*. *Silas* did not find that the prosecutor's proffered justifications there were "inextricably intertwined with race." Rather, the court concluded that the prosecutor's justifications met the "low bar" for facial race-neutrality, but that given all the circumstances, the trial court should not have credited the genuineness of those justifications. (*Silas*, *supra*, 68 Cal.App.5th at pp. 1100–1108.) Richard concedes that the prosecutor's justifications here similarly met the "low bar" for facial race-neutrality, and he has offered no reason to conclude that the trial court erred in crediting those justifications at *Batson*/*Wheeler*'s third step.

## Richard's Counsel Was Not Ineffective In Failing to Object to the Prosecutor's Remarks During Closing Argument Allegedly Shifting the Burden of Proof

Richard's second argument is that his trial counsel was ineffective in failing to object to the prosecutor's statement during closing argument that "[y]ou have to believe that to find these defendants not guilty" as improperly shifting the prosecution's burden of proof.

### Background

In describing the defense theory of the case as part of his rebuttal closing argument, the prosecutor stated as follows:

"But here's what you have to believe. That Rudy Garcia, after dragging his brother into the house, did the following things: He ran up the street. He searched for shell casings. He had a full-on conversation with Deanna Merritt. He ran back down the street, changed his clothes, hid the gun, hid the flashlight he was using to look for casings, and then made himself available to the police, and did such a good job of it, was so amazing as an actor that at the end when they tell him his brother is dead, he breaks down and says, How am I going to tell our mother about this? Despite the fact that

23

he is really the shooter in this incident. You have to believe that to find these defendants not guilty.

"MR. BURKE [Poles's counsel]: Objection. Improper argument.

"THE COURT: Overruled."

**Applicable Law**

"A prosecutor's conduct ' "violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citation.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. " ' " ' (*People v. Rhoades* (2019) 8 Cal.5th 393, 418.) Under state law, 'bad faith on the prosecutor's part is not required.' (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)" (*People v. Zarazua* (2022) 85 Cal.App.5th 639, 644.)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 702 (*Mendoza*).) However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' (*People v. Marshall* (1996) 13 Cal.4th 799, 831 (*Marshall*); accord, *People v. Hill* (1998) 17 Cal.4th 800, 829 (*Hill*).) . . . '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' ([*Hill*,] at p. 823, fn. 1.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' (*Marshall*, *supra*, 13 Cal.4th at p. 831), there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*People v. Centeno, supra,* 60 Cal.4th at pp. 666–667.)

" '[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [Citation.]' (*People v. Crew* (2003) 31 Cal.4th 822, 839.)" (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel," as Richard argues here. (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) He bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *People v. Ledesma* (2006) 39 Cal.4th 641, 746; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.) In establishing prejudice, it is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a "reasonable probability" that absent the errors the result would have been different.

(*People v. Williams* (1997) 16 Cal.4th 153, 215; *People v. Ledesma, supra,*
43 Cal.3d at pp. 217–218.)

**Analysis**

Even if the prosecutor's statement that "[y]ou have to believe that to
find these defendants not guilty" constituted improper burden shifting and
Richard's counsel had no satisfactory reason for failing to object and request
an admonition, his ineffective assistance of counsel claim must be rejected
because he has failed to demonstrate a reasonable probability the outcome of
his trial would have been different absent the error.

First, Poles's counsel *did* object to the prosecutor's statement, and the
trial court overruled the objection. Richard has made no showing that joining
in the objection would have resulted in the trial court instead sustaining the
objection and giving the jury an admonition. (See, e.g., *People v. Mitcham*
(1992) 1 Cal.4th 1027, 1059 [rejecting claim that failure to object to exhibit
was ineffective assistance of counsel in part because "the trial court overruled
the objection of [co-defendant']s counsel" to exhibit].)

Second, Richard's ineffective assistance argument fails because,
considering the " 'whole argument and the instructions,' " we do not find any
"reasonable likelihood the jury understood or applied the complained-of
comments in an improper or erroneous manner." (See *People v. Centeno,
supra*, 60 Cal.4th at p. 667; *People v. Thomas* (1992) 2 Cal.4th 489, 531
[where "the prosecutor did not engage in any prejudicial misconduct . . . [i]t
follows that defense counsel was not ineffective in making no objection"].)

Before closing arguments began, the trial court instructed the jury that
"[the presumption of innocence] requires that the People prove a defendant
guilty beyond a reasonable doubt," that "[w]henever I tell you the People
must prove something, I mean they must prove it beyond a reasonable

26

doubt." Later, the court again confirmed that "[t]he People have the burden of proving each allegation beyond a reasonable doubt." Along the way, the trial court elaborated that "[t]he People have the burden of proving beyond a reasonable doubt 'that it was the defendant who committed the crime,' " "that the defendant did not withdraw," "that the killing was not justified," "that the killing was first-degree murder rather than a lesser crime," "that the defendant did not kill as a result of a sudden quarrel or in the heat of passion," and that "the defendant was not acting in imperfect self-defense or imperfect defense of another." And the trial court told the jury that "because he bears the burden of proof," the prosecutor would have an opportunity to make a rebuttal argument. And indeed, the prosecutor began his rebuttal by telling the jury that "because the burden of proof is mine, I do get the last chance to talk to you."

As part of her closing argument, Richard's defense counsel repeatedly emphasized the prosecution's burden, telling the jury that "the burden of proof rests solely on the Prosecution," the "burden of proof . . . rests solely with Mr. DeFerrari and the Prosecution," "[t]he burden of proof is on the Prosecution," that "the burden has to be on the Prosecution," and that the jury had to "hold the prosecutor to their burden of proof and proof beyond a reasonable doubt." And, defense counsel added, "burden shifting is when the Government tries to say, Mr. Defense attorney, why don't you prove beyond a reasonable doubt [for example,] that two guns were used," which was "[n]ot our job." In short, the instructions and the argument of counsel as a whole made clear that the prosecution bore the burden of proof.

Perhaps more importantly, very shortly—some two pages in the reporter's transcript—after the trial court overruled the objection to the

27

statement at issue, following colloquy occurred as the prosecutor continued his argument:

"MR. DeFERRARI: . . . So you know, ladies and gentlemen, the Defense has no burden of proof. The burden of proof is with the People. I have the burden of proof [in] this case beyond a reasonable doubt. You can consider the failure to call logical and necessary witnesses. For example, in this case, the Defense opted to call several witnesses. One of those witnesses was Gregg Stutchman. They paid him $8,000, and more because he probably made another three or four or five hundred for his testimony. Right?

"Why not process the gunshot residue kit for Raul Garcia?

"MR. BURKE: Objection. Improper argument burden shifting.

"MS. SCOFIELD: Objection. Improper argument.

"THE COURT: Well, the burden is always on the People to prove the case each and every element beyond a reasonable doubt, but I don't believe it's improper argument as long as you keep that in mind.

"MR. DeFERRARI: You can consider what wasn't done or what wasn't tested recognizing the burden is on me. That is the burden. For instance, if this were an alibi case and the defendant said we were at a dinner party with tons of people around, hypothetically, at the French Laundry, right? You would expect them to call in the wait staff or the people that observed them there to say, No, they were at the restaurant. They were not in Antioch.

"When you decide and conclude that this case has been proven beyond a reasonable doubt, you will see that self-defense wasn't close in this case. There is no evidence that the defendants, either of them, harbored an actual belief that they were in imminent danger or death . . . ."

Had the trial court sustained an objection to the comment at issue, it would have properly admonished the jury—as it did in response to a similar

28

objection shortly afterward—that the prosecution bore the burden of proof and that the defense had no burden to produce any evidence or establish any facts to prove the defendants' innocence. But the jury *was* given just such an admonition only a brief time later in the prosecutor's argument. A second such admonition may have had some marginal benefit to the defense, but a review of the jury instructions as a whole—which repeatedly emphasized the prosecution's burden of proof—as well as the entire closing arguments of counsel leaves us convinced that there was no " 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner' "—and thus no reasonable probability of a different result even with a second admonition. (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

**The Prosecutor Did Not Commit Misconduct During Closing Argument by Inaccurately Describing the Law of Imperfect Self-Defense/Voluntary Manslaughter**

Richard's third argument is that the prosecutor committed prejudicial misconduct during his closing argument because his "statement that [the jury could] perform an average-person analysis was misleading" as it did not apply to one of the theories of manslaughter—voluntary manslaughter based on imperfect self-defense—that Richard relied on.

**Background**

The following took place during the prosecutor's rebuttal argument:

"Mr. DeFERRARI: . . . I did want to touch on voluntary manslaughter. Both counsel mentioned it. Let's get it out there. Here's what they—what you need to see for voluntary manslaughter. Here's the evidence you need to fit here:

"Under the influence of intense emotion that obscured his or her reasoning or judgment.

29

"How do you know that's not the case here?  Because this was—there was a conflagration at the Chevron.  There was an argument.  The question is, were Mr. Richard's and Ms. Poles'[s] emotions so high, so high that they obscured their ability to reason?  The answer to that question is no because both defendants had the wherewithal to track the victims.  Mr. Richard to go home to get the gun.  The reason was there.  What's a classic example of the provocation necessary for self-defense?  Right?  You're not allowed to set up your own standard of conduct.

"You are allowed to consider what would a normal, average person do in this situation?  Would they lose it?  Hunt these people down and kill them?

"MR. BURKE [Poles's counsel]:  Objection.  Improper argument.  Misstates the law.  Average person doesn't have to kill.

"THE COURT:  He's arguing from the law as I read it I believe.

"MS. SCOFIELD [Richard's counsel]:  That's for imperfect.

"THE COURT:  No, no, you had me—I gave both voluntary manslaughter.  I gave heat of passion, and I gave imperfect as requested.

"MR. BURKE:  May we have a sidebar, please?

"THE COURT:  Excuse us.

([Unreported] [s]idebar conference.)

"THE COURT:  So as we've discussed, you will have copies of the instructions.  I, myself, have not memorized them, so let me just—you would think after all these years, I would have them memorized.  So I will sustain the objection and simply which paragraph is that?

"MR. BURKE:  I don't have it in front of me.  I'm sorry.

"THE COURT:  Oh, so the elements—a defendant killed someone because of sudden quarrel or in the heat of passion if:

"1.  The defendant was provoked;

30

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his or her reasoning or judgment; and

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation that is from passion rather than from judgment.

"Is that what you were referring to?

"MR. BURKE: No. I think may we go into chambers briefly, please?

"THE COURT: I'll read the whole thing."

[The court then read the entire jury instruction for heat-of-passion voluntary manslaughter.]

"So that's the whole instruction. So sustained. Go ahead, Mr. DeFerrari."

**Analysis**

We do not agree that there was anything "misleading" about the prosecutor's statement, and it was certainly not a misstatement of the law. By specifically referencing "the influence of intense emotion that obscured his or her reasoning or judgment," the prosecutor made clear that he was referring to voluntary manslaughter under a heat of passion theory, which requires that "[t]he defendant was provoked," that "[a]s a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his or her reasoning or judgment," and that "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The fact that the prosecutor did not go on to add that the other theory of voluntary manslaughter—imperfect self-defense—did not require

31

an average person analysis does not mean that the prosecutor misstated the law.

In any event, " '[i]n the context of the whole argument and the instructions,' " there was no " 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.) The jury was correctly instructed on both heat of passion and imperfect self defense theories of voluntary manslaughter, both orally and in the written instructions, and Richard does not contend otherwise.

Indeed, immediately after the challenged remarks, the prosecutor explained both theories of voluntary manslaughter, noting that "[i]f enough time has passed the provocation for an ordinary person of average disposition to cool off and regain his or her reasoning, the killing is not voluntary manslaughter," and arguing that was the case here because "[t]he defendants had eight minutes, eight long minutes" to "cool off and regain [their] reasoning," then going on to explain "[t]here's a second type of voluntary manslaughter. Imperfect self-defense. There is no evidence here, none, that either defendant actually believed they had to use deadly force."

In addition, as part of her closing argument, Richard's counsel gave the following explanation, again clarifying the difference between the two types of voluntary manslaughter: "Voluntary manslaughter. There's two under voluntary manslaughter. Imperfect self-defense or defense of others and heat of passion. Now, imperfect self-defense requires and prove, disprove, actual belief in danger and actual belief that immediate use of force was necessary and that one of those beliefs is unreasonable. In the heat of passion, if the facts in this case show that the killing was provoked and that Mr. Richard acted as a result rationally and an average person placed in his situation

32

with his relationship in this case acted from passion rather than judgment, that is a voluntary manslaughter.

"So what I want to highlight between these different charges is, as you can see, there's the same result, which is the death of Raul Garcia, but what makes it different is the intent. Each one of them is different because the intent is different, and that makes sense because an act that is methodical, calculated, cold is different than an act that is rash, impulsive, passionate. That's why they are different charges that you must consider. And each one of these charges when you consider them, you must consider him innocent. The burden of proof is on the Prosecution. The Prosecution must prove every element, and the Prosecution must prove no self-defense or defense of others."[7]

### There Was No Cumulative Error

Finally, Richard argues that the cumulative effect of the errors he alleges denied him due process under the Fourteenth Amendment. "As we have found no substantial error in any respect, this claim must be rejected." (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

### Poles' Appeal (A162369)

Poles argues that her conviction must be reversed because there was no substantial evidence that she had any intent to kill Raul Garcia, because Richard did not have a gun during the initial confrontation at the gas station, and because she did not threaten anyone, and that the jury failed to draw

---

[7] Richard also argues that if his counsel's statement that "That's for imperfect" was insufficient to join Poles's counsel's objection to the prosecutor's remarks, then his counsel provided ineffective assistance in failing to join in the objection. Because we conclude there was no prejudicial misconduct, this argument necessarily fails. (See *People v. Thomas, supra,* 2 Cal.4th at p. 531.)

reasonable conclusions from the circumstantial evidence that pointed to her innocence.

**Substantial Evidence Supports the Jury's Finding That Poles Had the Intent to Kill**

To convict Poles on a theory that she aided and abetted Richard in killing Raul Garcia, the prosecution was required to establish that "with the intent to kill, [Poles] aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree." (§ 189, subd. (e)(2).)

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

In this case, there was ample substantial evidence to support the jury's finding that Poles had the requisite intent to kill, including evidence of the following: Poles initiated the confrontation at the gas station. She told the men " 'I have my nigga come pop y'all ass.' " Shortly thereafter, Richard arrived, who repeatedly told the men "I'll spray all you," "I'll kill all you motherfuckers," and "I'll shoot all you motherfuckers." After the confrontation at the gas station ended, Poles could have simply left, but instead she followed Raul and Rudy, coming within two to three feet of their car and pursuing them at high rate of speed even as they drove evasively in an attempt to get away from her. All the while, Poles was on the phone with Richard, strongly supporting the inference that she assisted him in returning to Raul and Rudy's location with a gun, thereby enabling him to commit the murder. In short, substantial evidence supports the jury's finding that Poles had the intent to kill.

**The Jury Did Not Fail to Follow CALCRIM No. 224**

Poles also argues that in finding Poles guilty, the jury failed to follow CALCRIM No. 224, which states: "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence." Poles argues that the evidence was also consistent with the conclusion that she had no intent to kill, because, for example, she was "upset and afraid" after the confrontation and only began to follow Raul and Rudy once they took pictures of her car, or that Richard alone escalated the confrontation "without any input whatsoever" from Poles. We disagree.

In the first place, the evidence of Poles' intent was not entirely circumstantial, and so CALCRIM No. 224 is not applicable. As noted, Beals told police that during the confrontation at the gas station, Poles said " 'I

35

have my nigga come pop y'all ass' "—direct evidence that her intent was to have Richard retrieve his gun and shoot them.

We also do not agree that the scenarios posited by Poles are equally "reasonable conclusions" to be drawn from the circumstantial evidence. There was no evidence, circumstantial or otherwise, that Poles was "upset and afraid" after the confrontation at the gas station. Indeed, the evidence showed that Poles began following Raul and Rudy and pulled her car within a few feet of theirs *before* they took two photos of her vehicle. Poles does not explain how Richard could have possibly relocated Raul and Rudy "without any input" from her. The weight and importance of the evidence was for the jury to decide, and "[w]e . . . "presume [jurors] generally understand and follow instructions," including CALCRIM No. 224. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

## DISPOSITION

The judgments are affirmed.

_____
Richman, J.

We concur:


_____
Stewart, P.J.


_____
Miller, J.


*People v. Richard* (A162365); *People v. Poles* (A162369)

37